INTERNATIONAL SHOE CO. *v.* C. G. FLECKENSTEIN CO.

1. SALES—BREACH OF CONTRACT — GOODS SHIPPED MUST EQUAL SAMPLE.

In an action by the purchaser to recover the purchase price, freight, and handling charges of a car load of scrap sole leather, rejected because claimed to be inferior to the sample furnished by defendant, the basic issue is whether the goods shipped and paid for by plaintiff were equal in quality for the purpose purchased to the sample defendant furnished.[1]

2. SAME—EVIDENCE—ADMISSIBILITY.

Where defendant agreed to furnish plaintiff scrap equal to the sample furnished at a certain price per ton, evidence that the value of the sole leather from which the sample was produced would be very much higher, *held*, inadmissible.[2]

---

[1]Sales, 35 Cyc. p. 610; [2]Id., 35 Cyc. 610.
On right of purchaser to reject goods for breach of warranty on sale by sample, 27 L. R. A. (N. S.) 922.

3. APPEAL AND ERROR—ADMISSION OF INCOMPETENT EVIDENCE IN CASE TRIED BY JUDGE WITHOUT JURY NOT NECESSARILY REVERSIBLE ERROR.

Since, in cases tried before the court without a jury, the rules of evidence are not always strictly observed, the admission of incompetent evidence in a case so tried will not be presumed to have worked prejudicially in the mind of the court requiring reversal on that ground alone.[3]

4. SALES—FINDING OF COURT—EVIDENTIAL SUPPORT.

The finding of the court that "the sample which had been furnished was taken from one day's accumulation of scrap leather under the same circumstances and conditions which surrounded the storing and accumulation of the leather shipped," *held*, not supported by the record.[4]

5. SAME—CAUSE OF INFERIORITY OF GOODS SOLD NOT CONTROLLING.

The finding of the trial court that the scrap shipped was not acid burned, as testified to by some of plaintiff's witnesses in expressing an opinion as to why it was inferior to the sample, even if justified by the record, is not controlling of the basic issue as to whether it complied in quality with the sample.[5]

6. SAME—COMPARISON OF GOODS SHIPPED WITH SAMPLE SUBMITTED ESSENTIAL WHERE INTRODUCED AS EXHIBITS.

A careful inspection and comparison of samples of the scrap shipped and of the sample submitted to plaintiff, which were introduced as exhibits, *held*, essential to a right determination of the facts from all the evidence in the case considered collectively.[6]

7. SAME—FINDING OF COURT—EVIDENTIAL SUPPORT.

The ultimate conclusion of law reached by the trial court that plaintiff had no cause of action, *held*, without evidential support or against the great weight of convincing evidence.[7]

Error to Muskegon; Vanderwerp (John), J.   Submitted June 10, 1924.   (Docket No. 9.)   Decided April 3, 1925.

Assumpsit by the International Shoe Company

---

[3]Appeal and Error, 4 C. J. § 2982; [4]Sales, 35 Cyc. 611 (1926 Anno); [5]Id., 35 Cyc. p. 611 (1926 Anno); [6]Id., 35 Cyc. p. 611 (1926 Anno); [7]Appeal and Error, 4 C. J. § 2857.

against the C. G. Fleckenstein Company for breach of a contract of sale.    Judgment for defendant.    Plaintiff brings error.    Reversed.

*Carpenter & Jackson*, for appellant.

*Harris E. Galpin (Joseph T. Riley*, of counsel), for appellee.

STEERE, J.    Plaintiff is a manufacturer of shoes located in St. Louis, Missouri.    Defendant is a tanner and sole cutter located at Muskegon, Michigan.    This litigation involves a car load of scrap sole leather known as "heeling," used for lifts in shoe heels, bought by plaintiff from defendant by sample and rejected because not in compliance with the sample furnished.    In August, 1921, defendant's representative, Ray Fleckenstein, solicited plaintiff's manager at St. Louis to buy a car load of heeling, representing that the car load he offered was "an extra good bargain." Plaintiff's superintendent replied favorably and told the agent to send them a sample by express.    The sample sent was of good fibre, flexible and first-class. Plaintiff sent an order on August 16th for the car load, reading as follows:

"St. Louis, Mo.,
August 16, 1921.
"Ordered by Mr. J. P. Downton.
"C. G. FLECKENSTEIN,
"Muskegon, Mich.
"Please enter our order below, at the price and terms named, and for deliveries specified:
"Ship to International Shoe Company, Mississippi and Hickory, St. Louis, Mo.
"Note:    Send invoice in duplicate and bill of lading to 1501 Washington avenue, St. Louis, Mo.
"Party to whom shipped and order number above must appear on your invoices.
"1 car of No. 8 half heeling—$50 per ton.

"Terms: 1 per cent. ten days F. O. B. Muskegon.
"The above car is to be similar in size, weight and quality to sample recently sent us.
"This car is to be shipped on August 22d.
"INTERNATIONAL SHOE CO.,
"By J. P. DOWNTON."

A car load of heeling was soon thereafter shipped by defendant to St. Louis and invoice sent to plaintiff. It read in part as follows:

"(Flexoak)—C. G. FLECKENSTEIN CO.,
"Tanners and Sole Cutters,
"Muskegon, Michigan.  *  *  *
"Terms 2 per cent. ten days.
"F. O. B. Muskegon, Mich.  *  *  *
"Date of invoice, 8-18-21.
"Sold to INTERNATIONAL SHOE CO.,
"St. Louis, Mo.
"1 car No. 8 heeling 33241 lbs.  50.00 ton—851.02.
"Shipped in car P. R. R. U. L. 33400."

On receipt of the invoice plaintiff promptly paid for the consignment, less the 2 per cent. discount, and on arrival of the car had it unloaded. Instead of being shipped in bags, as is said to be the custom, the scrap leather was in bales many of which broke open in transit. When taken to plaintiff's factory the broken bales gave ready opportunity to observe the condition of their contents and plaintiff's foreman testified he did so, finding the leather of poor quality, fibreless and brittle owing to its treatment, the pieces would break in two when bent and were not suitable for use in making heels. Plaintiff thereupon inspected it thoroughly, found it brittle, the leather fibre destroyed, caused, it was thought, by acid burning and rejected it because not fit for use as heeling and inferior in quality to the sample, promptly notifying defendant. Owing to the broken condition of the packages in which it came plaintiff found it necessary to sack it,

229—Mich.—44.

which was done and defendant so notified. Plaintiff called in experts from other shoe concerns to examine the consignment. They testified the leather was inferior to the sample, very lifeless and brittle, and unfit for use as heeling. Considerable correspondence with defendant followed in an attempt to adjust the matter, which failed, and after notifying defendant that the leather was in a storehouse subject to its order plaintiff demanded repayment of the purchase price, freight and handling charges, which was met by refusal, and this action was then brought in the Muskegon county circuit court to recover the same.

It was shown that none of the samples sent plaintiff by express, on the strength of which the offered car load was ordered, were taken from that car load, or from defendant's stock of heeling on hand when the order was solicited; but were the product of a subsequent day's sole cutting just before the samples were sent, while the car load shipped was composed of an accumulation of scrap leather throughout most of the preceding year from whatever kinds of sole leather defendant was cutting. Defendant's president, Norbert Fleckenstein, said of this in part:

"The leather in question that was shipped to the plaintiff was specified as No. 8 half heeling. That is two pieces would make a heel. * * * Things were going slack and it took us pretty near a year to accumulate a car of this. I presume a portion of this leather that was shipped to plaintiff was fairly dry, owing to the fact that it had been on hand a long time in a frame warehouse and it got pretty hot in the summer time. Leather to be in marketable condition usually contains from ten to fourteen per cent. of moisture. This stock in question probably does not contain two per cent. * * * I put up those samples. I took them just where they had fallen that day from the machine, so they were samples of what our machine was making on the particular day I packed them up. These other goods that I shipped

to the International Shoe Company were accumulated for a year's time prior to that."

The case was tried before the court without a jury. On the trial plaintiff produced as exhibits the samples it had received on which its purchase was based, and a sack from the consignment with proof that it was a fair sample of the car load as a whole, taken unselected and at random "from the top of probably 20 different bags out of the shipment." Plaintiff's ground for rejection was that the car load was far inferior to the sample, being very brittle, contained many heavy and curved brittle pieces difficult to press out, entailing loss and additional expense if usable at all, and most of the consignment was so brittle and defective in quality that it could not be used in making the class of heels plaintiff manufactured, while the sample sent was flexible, of good quality, in excellent condition and well adapted for its use.

At conclusion of the case the court first delivered an opinion, saying in conclusion:

"The burden of proof being on the plaintiff, I am not satisfied that it has established its case, and the judgment will eventually be for the defendant—No cause of action—after findings have been prepared by defendant's attorney for submission to me."

Defendant's attorney thereafter prepared findings of fact, with the "conclusion of law" that "plaintiff has no cause of action against said defendant, that judgment should, therefore, be entered for defendant with costs to be taxed." This was signed by the court and served on plaintiff's attorneys, who then proposed and served amendments. They contained a more complete recital of undisputed facts claimed material and additions to or changes of facts found which it was claimed the overwhelming weight of evidence justified, and especially that the goods shipped were so inferior

in quality to the samples sent as to be unfit for use by plaintiff in the manufacture of heels.

On hearing of the proposed amendments plaintiff's counsel produced before the court the samples introduced as exhibits upon the trial and especially requested the court to make a personal examination and comparison of them to test the question of whether the goods shipped were in fact equal in quality to the samples sent plaintiff, claiming that upon the trial the court had only seen them from the bench when produced in court and examined or handled by counsel or witnesses.    The court refused to make the examination requested at that hearing and some six months after the amendments were proposed filed further findings of facts not in harmony on the vital issues with those requested by plaintiff, arriving at the same conclusion of law as before, and ordered judgment entered for defendant.    Objections and exceptions were duly taken by plaintiff and incorporated in the bill of exceptions.    Upon hearing of the case in this court the bags of samples introduced as exhibits in the trial court were produced and submitted for inspection and comparison.    That they were the identical exhibits is not disputed.    Neither do we find from the record that the verity of those samples was questioned in the trial court.

Plaintiff's assignments of error as condensed and argued are directed against:

(1) Admission of evidence of the price of leather when manufactured into soles.

(2) Finding by the court that the sample on which plaintiff based its order was taken from one day's accumulation "under the same circumstances and conditions which surrounded the storing and accumulation of the leather shipped."

(3) Finding that the leather shipped was equal to the sample on which the order was based.

(4) Refusal of the court to personally examine and compare the two samples as requested.

The court permitted the defense, against objection, to introduce testimony of two witnesses that the price of soles made from the leather of which the heeling in question was the waste, or scraps, as sold by the pound, would bring from $700 to as high as $2,000 per ton, while it was shown this sole leather in the form of heeling was sold to plaintiff for $50 per ton. It is contended that this testimony was clearly immaterial for any legitimate purpose and the defense could have no other object in introducing and repeating it than to create a prejudicial atmosphere by showing the comparatively small price at which plaintiff bought heeling of the same leather.

The basic issue in this case was whether the goods shipped were equal in quality for the purpose purchased to the sample defendant furnished.    If they were not plaintiff had a right to reject the consignment.    The price manufactured soles brought per pound could furnish no legitimate aid in solution of that question.    It would not be competent if before a jury to allow counsel to argue that it was.    But this case was tried before the court without a jury where the rules of evidence are not always so strictly observed or enforced and, although unable to divine why such testimony was admitted against objection, we are not prepared to presume it worked prejudicially on the mind of the court and reverse the case on that ground alone.

In plaintiff's proposed amendments to the findings the court was requested to find as follows:

"The shipment made by (to) the plaintiff was of scrap leather which had accumulated daily and had been stored for a period of several months.    The sample on which the order was based was taken from a single day's work and not from the accumulation from which the shipment was made."

In its final findings of February 28, 1923, the court

refused this request and found upon that subject as follows:

"On the trial of the case it was shown by the defendant that the shipment made by it to the plaintiff was of scrap leather which had accumulated daily during a period of several months and that the sample which had been furnished was taken from one day's accumulation of scrap leather under the same circumstances and conditions which surrounded the storing and accumulation of the leather shipped."

The testimony does not bear out that portion of this finding which states without qualification that the sample furnished was taken "from one day's accumulation of scrap leather under the same circumstances and conditions which surrounded the storing and accumulation of the leather shipped." In addition to what we have already quoted from the testimony of defendant's president he stated of the shipment:

"We got a wire from Mr. Ray Fleckenstein about 7:30 or 8:00 o'clock one night to express a sample immediately to International Shoe Company of No. 8 heeling, so we went out and instead of going to the warehouse and breaking open a bale we went to where the scrap trimmers had thrown their day's produce of scrap and filled a bag with that and put it on the 10:30 train."

Vice-president Lee Fleckenstein testified of the shipment:

"It included all the eight and nine approximately that went through the tannery. Every class and grade of leather, whether from bands and pates or bellies, or any other part of the hide that went through the sole cutting department during the year, went to the plaintiff in this case."

We discover no testimony on the part of defendant that the leather on which they were working on the day the sample was taken corresponded in quality with

the average of that from which the heeling was taken and stored in the warehouse "where it got pretty hot in the summer time," during the preceding year. It is undisputed that the samples were first-class, from a well tanned extra quality of sole leather, and that they never were stored in the warehouse from which the shipment was taken.   The testimony does not warrant the portion of the finding complained of.

Plaintiff's various expert witnesses testified unequivocally from personal examination and comparison that the sample from the consignment was not equal to the sample sent, stating wherein they found it inferior, and expressed the opinion that its inferior quality was imputable to its being acid burned.   Defendant's president was the only witness who testified on the subject of the leather being acid burned.   He testified that they did not manufacture heels, the business of his company being to "manufacture chrome re-tanned sole leather;" that the expression "acid burned" could be used in connection with "bark tanning leather," but he never heard it before in relation to what is called "chrome re-tanned leather," for in that method of treatment "no acid material is used directly in connection with the hide," saying of their process:

"We are the only people that are really producing a stock of that kind.   The leather is first tanned by using mineral material.   That makes it impervious to heat.   Before we pass that along in our process we cut pieces of the hide and boil them to see if they are thoroughly tanned.   If they are tanned they will stand boiling.   After that, they are put into the vats and they are re-tanned in bark mixture.   *   *   * We don't use any acid in direct contact with the hide at all.   The acid is used in connection with the glucose and the action of the acid with the glucose reduces it down so slight you can just about taste it.   I presume that differs a good deal from the ordinary tanning process."

The court was apparently impressed by this testimony that plaintiff's witnesses were mistaken in their conclusions as to the cause of the inferior condition in which they testified they found the consignments, and therefore mistaken in their testimony that it was inferior to the sample, and in that connection found—

"as a conclusion of fact that the defendant has conclusively shown that the leather shipped to the plaintiff was not acid burned and in fact none of the leather had been at any time treated by acid."

As its president described defendant's process, it differed "a good deal from the ordinary tanning process" in "producing a stock of that kind." The leather was twice tanned; first by using some undefined mineral material adequate to render it "impervious to heat," and thereafter in the course of the process was "re-tanned in bark mixture." He said "acid burned" was an expression which "could be used in connection with bark tanning leather," and admitted acid was used in their process, though not "in direct contact with the hide," and was reduced down by glucose until "you could just about taste it," not disclosing, however, at what stage of the process or by whom the tasting took place. While imputing the inferior condition of the leather to acid burn plaintiff rejected the shipment because it was not similar in quality to the sample. During the correspondence between the parties plaintiff wrote defendant:

"There is not one single piece of brittle leather in the sample of which there is such a large quantity in the car load. This is a stock which we will not use in our heels and regardless of whether or not this is acid burnt, it is entirely too poor in quality for us to consider using."

Conceding the court had before it adequate supporting evidence to warrant the finding that it was conclusively shown the leather shipped was not acid

burned the basic issue was whether it complied in quality with the sample.    Upon that issue the respective samples introduced as exhibits are direct and competent evidence not to be lightly overlooked.    This court has, while in consultation on this case, inspected and compared them, and is of opinion that a careful inspection and comparison of them by appearance and test of quality is not only illuminating but essential to a right determination of the facts from all the evidence in this case considered collectively.

We are impressed from a careful consideration of this record in its entirety that the ultimate conclusion of law which the trial court reached was based on facts found which were without evidential support or against the great weight of convincing evidence, and that a new trial should be granted.    As the case will be for re-trial the testimony of the respective witnesses will not be further reviewed.

The judgment is reversed with costs to plaintiff, and a re-trial granted.

McDONALD, C. J., and CLARK, SHARPE, MOORE, FELLOWS, and WIEST, JJ., concurred.    BIRD, J., did not sit.